71 F.3d 119
 64 USLW 2369, 1995-2 Trade Cases P 71,191,
43 Fed. R. Evid. Serv. 492
 SUPERMARKET OF MARLINTON, INCORPORATED, Plaintiff-Appellant,
v.
MEADOW GOLD DAIRIES, INCORPORATED; Borden, Incorporated;
Valley Rich Dairy; Flav-O-Rich, Incorporated;
The Valley of Virginia Cooperative Milk
Producers Association,
Defendants-Appellees.
State of Maryland; State of Alaska; State of Arizona;
State of Arkansas; State of Connecticut; State of
Delaware; State of Florida; State of Hawaii; State of
Idaho; State of Indiana; State of Kansas; State of
Kentucky; State of Louisiana; State of Massachusetts;
State of Michigan; State of Mississippi; State of
Missouri; State of Nevada; State of New Hampshire; State
of New Jersey; State of New Mexico; State of North
Carolina; State of Ohio; State of Oklahoma; State of
Pennsylvania; State of Rhode Island; State of South
Dakota; State of Virginia; State of West Virginia; the
District of Columbia, Amici Curiae.
 No. 94-2602.
 United States Court of Appeals,
Fourth Circuit.
 Argued Sept. 27, 1995.
Decided Dec. 1, 1995.
 
 ARGUED: Charles Leonard Egan, Fort & Schlefer, L.L.P., Washington, DC, for Appellant. Michael Francis Urbanski, Woods, Rogers & Hazlegrove, Roanoke, Virginia; Michael A. Doyle, Alston & Bird, Atlanta, Georgia, for Appellees. ON BRIEF: William C. Buckhold, Fort & Schlefer, L.L.P., Washington, DC, for Appellant. Francis H. Casola, Woods, Rogers & Hazlegrove, Roanoke, Virginia, for Appellees Valley Rich Dairy and Milk Producers Assoc.; Teresa D. Thebaut, Julia O'Meara Lynch, Alston & Bird, Atlanta, Georgia, for Appellees Meadow Gold and Borden; John McLaughlin, Goldberg & Simpson, P.S.C., Louisville, Kentucky, for Appellee Flav-O-Rich. J. Joseph Curran, Jr., Attorney General of Maryland, Ellen S. Cooper, Assistant Attorney General/Chief, Antitrust Division, Katharine M. Ebersberger, Assistant Attorney General, Baltimore, Maryland, for Amici Curiae.
 Before MICHAEL and MOTZ, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 Reversed and remanded by published opinion. Judge MOTZ wrote the opinion, in which Judge MICHAEL and Senior Judge CHAPMAN joined.
 OPINION
 DIANA GRIBBON MOTZ, Circuit Judge:
 
 
 1
 In this antitrust action a group of retail food stores alleged that certain large dairies conspired to fix milk prices. The district court granted summary judgment to the defendant dairies, finding this action to be barred by the applicable statute of limitations. In doing so, the court rejected the food stores' contention that the statute of limitations had been tolled by the doctrine of fraudulent concealment. Because we conclude that the district court used an improper standard to determine that the fraudulent concealment doctrine did not apply, we reverse and remand for further proceedings.
 
 I.
 
 2
 Supermarket of Marlinton, Inc. filed this action in 1993, against Valley Rich Dairy, Flav-O-Rich, Inc., Meadow Gold Dairies, Inc., Borden, Inc., and Valley of Virginia Co-operative Milk Producers Association, alleging that the dairies had conspired to fix the price of milk sold in the wholesale market in violation of the Sherman Act, 15 U.S.C. Sec. 1. Marlinton's complaint followed a 1992 investigation by the United States Department of Justice into the milk industry, which had resulted in Valley Rich, Meadow Gold, and Borden pleading guilty to charges that they had rigged school milk bids. This investigation also led to the indictment and subsequent trial of three Meadow Gold officials. The three were individually charged with rigging school milk bids and with conspiring to fix the price of milk sold to commercial and institutional customers in western Virginia and southern West Virginia.
 
 
 3
 The government based its case against the Meadow Gold officials primarily on the testimony of Paul French, a former general manager of Valley Rich. French testified, under a grant of immunity, about meetings in which he and the Meadow Gold officials had conspired to fix milk prices. French stated that all meetings were in person, prearranged, and conducted away from the office in parking lots, restaurants, or private automobiles. Aware that price-fixing violated the law, French related that he would not discuss the subject over the telephone or if non-conspirators were present. French further testified that he would fill out his expense accounts in such a manner that no one, including his co-workers at Valley Rich, would know of his meetings with rival dairy officials. Despite this evidence, the trial of the Meadow Gold officials ended in a hung jury and the United States dropped the charges. French's testimony, however, became the basis for Marlinton's present action against the dairies.
 
 
 4
 In its complaint Marlinton alleged that the dairies' price-fixing conspiracy continued from 1984 until 1987. Marlinton acknowledges that on its face the complaint, filed in 1993, appears to be time-barred by the applicable four-year statute of limitations, Sec. 4B of the Clayton Act (15 U.S.C. Sec. 15b), but asserts that the doctrine of fraudulent concealment tolls the limitations period. The doctrine applies, Marlinton contends, because the dairies fraudulently concealed their price-fixing conspiracy, preventing Marlinton from discovering its claim until the 1992 federal criminal action provided Marlinton notice of the claim.
 
 
 5
 After the parties conducted discovery as to whether Marlinton had standing to bring this action and whether the fraudulent concealment doctrine tolled limitations, the dairies moved for summary judgment. The district court granted the dairies' motion on the ground that the statute of limitations barred Marlinton's claim. The court ruled that Marlinton could not rely on the fraudulent concealment tolling doctrine because Marlinton had not provided evidence that the dairies engaged in fraudulent concealment "separate and apart" from the antitrust conspiracy itself. Supermarket of Marlinton, Inc. v. Meadow Gold Dairies, Inc., 874 F.Supp. 721, 729 (W.D.Va.1994). French's testimony, the court ruled, was inadmissible hearsay and so could not be considered in determining whether the dairies had engaged in fraudulent concealment. Id. at 725-29. Because the court granted summary judgment based on the dairies' statute of limitations defense, it never addressed Marlinton's standing.
 
 
 6
 On appeal, Marlinton raises two related issues. First, it contends that the district court employed the wrong standard to determine that the fraudulent concealment doctrine did not toll the limitations period. Second, Marlinton maintains that because the court used this erroneous standard, it then incorrectly excluded French's testimony as inadmissible hearsay. In opposition, the dairies not only assert that the district court properly granted them summary judgment on the grounds set forth in its opinion, but claim they are also entitled to summary judgment because Marlinton failed to exercise due diligence and never established its standing to bring this action.
 
 II.
 
 7
 The purpose of the fraudulent concealment tolling doctrine is to prevent a defendant from "concealing a fraud, or ... committing a fraud in a manner that it concealed itself until" the defendant "could plead the statute of limitations to protect it." Bailey v. Glover, 88 U.S. (21 Wall.) 342, 349, 22 L.Ed. 636 (1874). Thus, pursuant to this doctrine, "when the fraud has been concealed or is of such a character as to conceal itself," and the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until the plaintiff discovers the fraud. Id. Although Bailey was a fraud action, the Supreme Court subsequently stated that the fraudulent concealment tolling doctrine is to be "read into every federal statute of limitation." Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). To invoke the doctrine in this circuit, a plaintiff in an antitrust action must satisfy each element of a three part test. Specifically, a plaintiff must demonstrate: (1) the party pleading the statute of limitations fraudulently concealed facts that are the basis of the plaintiff's claim, and (2) the plaintiff failed to discover those facts within the statutory period, despite (3) the exercise of due diligence. Weinberger v. Retail Credit Co., 498 F.2d 552, 555 (4th Cir.1974).
 
 
 8
 In recent years, federal courts have developed different standards for determining whether antitrust plaintiffs have satisfied the first element of this test. These are denominated the "self-concealing" standard, the "separate and apart" standard, and the intermediate, "affirmative acts" standard. Pursuant to the self-concealing standard, a plaintiff satisfies the first element merely by proving that a self-concealing antitrust violation has occurred. See New York v. Hendrickson Bros., Inc., 840 F.2d 1065, 1084 (2d Cir.), cert. denied, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988). At the opposite end of the spectrum is the separate and apart standard in which a plaintiff is required to provide evidence, separate and apart from the acts of concealment involved in the defendants' antitrust violation, that the defendants affirmatively acted to conceal the plaintiff's claim. See Colorado v. Western Paving Construction Co., 630 F.Supp. 206, 210 (D.Colo.1986), aff'd en banc by an equally divided court, 841 F.2d 1025 (10th Cir.), cert. denied, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). Finally, under the intermediate standard, a plaintiff must prove that the defendants affirmatively acted to conceal their antitrust violations, but the plaintiff's proof may include acts of concealment involved in the antitrust violation itself. See Texas v. Allan Construction Co., 851 F.2d 1526, 1532 (5th Cir.1988).
 
 
 9
 Our most recent antitrust precedent involving the application of the fraudulent concealment doctrine is Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp., 828 F.2d 211 (4th Cir.1987). There we did not expressly adopt any of the above standards or state to what extent our decision was based on the fact that the plaintiff had constructive notice of the antitrust violations or had failed to provide evidence of due diligence. Instead, we simply examined the allegations of the complaint and concluded that the plaintiff had failed to allege facts sufficient to invoke the fraudulent concealment doctrine. Id. at 218-19. In Pocahontas, the plaintiff alleged that the defendants had created "interlocking directorates" as part of a conspiracy to eliminate plaintiff's mining operations in violation of 15 U.S.C. Secs. 1-2. Id. at 217. The plaintiff asserted that the fraudulent concealment doctrine applied because the defendants had (1) concealed the existence of the interrelations between their companies and (2) secretly conspired to undertake boycotts, suspensions, and other measures designed to injure plaintiff's business. Id. at 218.
 
 
 10
 We rejected both arguments. As to the allegedly concealed interlocking directorates, we explained that it was "indisputable ... that any structural interrelationship between the corporate defendants was necessarily discoverable upon simple inquiry and consultation of public records." Pocahontas, 828 F.2d at 218. With regard to the conspiracy activities, we noted "the specific claim of concealment" was that when the plaintiff had asked the defendants why the price of delivered coal was so low, instead of admitting their conspiracy, the defendants had lied. Id. We held that failing to admit to illegal conduct upon general inquiry could not constitute "a claim of fraudulent concealment." Id. It was in this context that we then stated that " '[f]raudulent concealment' implies conduct more affirmatively directed at deflecting litigation than that alleged here; and 'due diligence' contemplates more than the unpursued inquiry allegedly made by Pocahontas." Id. at 219.
 
 
 11
 Focusing upon the latter language, in the present case the court below held that "the Fourth Circuit requires acts affirmatively directed at deflecting litigation" and that "[t]his standard clearly would exclude the self-concealing test as the controlling rule in this circuit." Marlinton, 874 F.Supp. at 725. The district court reasoned that since "[r]equiring an affirmative act is a greater burden than proving the mere existence of the conspiracy," Pocahontas mandated rejection of the "self-concealing" standard. Id.
 
 
 12
 The district court properly concluded that applying the self-concealing standard in this case would be inconsistent with Pocahontas. The self-concealing standard is only even arguably proper when deception or concealment is a necessary element of the antitrust violation, i.e., when the antitrust violation is truly self-concealing. See Hobson v. Wilson, 737 F.2d 1, 32-35 & n. 102 (D.C.Cir.1984), cert. denied, 470 U.S. 1084, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985). Just as deception was not an essential element of the interlocking directorates and conspiracy activities at issue in Pocahontas, it is not an essential element of the unlawful price-fixing conspiracy alleged in this case. Rather, the "deceptive aspect" of price-fixing is "intended solely to 'cover up' the illegal act," see Allan Construction, 851 F.2d at 1530; price-fixing is not by its very nature concealed. Cf. Brown v. American Broadcasting Co., 704 F.2d 1296, 1304 (4th Cir.1983) (electronic surveillance is "by its very nature a tort which is concealed from a potential plaintiff," therefore limitations period tolls until the plaintiff discovers, or should discover, her claim). Because price-fixing is not inevitably deceptive or concealing, application of the self-concealing standard here would be improper.[1]
 
 
 13
 After rejecting the self-concealing standard, the district court stated that it was "not clear" as to which of the remaining two standards was more consistent with Pocahontas, but ultimately concluded that the "deflecting litigation" language in Pocahontas indicated a preference for the separate and apart standard. Marlinton, 874 F.Supp. at 726. The trial court further found that even if Pocahontas could not be read to indicate such a preference, the separate and apart standard was "better reasoned" and so should be applied. Id. Unlike the district court, we find no implied support in Pocahontas for the separate and apart standard. Pocahontas did not involve an allegation of a self-concealing antitrust violation. Our observation, that to make out a claim of fraudulent concealment required evidence more "affirmatively directed at deflecting litigation" than the failure to admit illegal activity in response to a general inquiry, was simply a comment on the deficient allegations in Pocahontas. It was not an adoption--express or implied--of any of the three standards. There was no reason to adopt any of these standards in Pocahontas; they were not argued to the court or even developed in the case law at that time.
 
 
 14
 Nor are we persuaded that the separate and apart standard is "better reasoned" than the intermediate, affirmative acts standard. Because almost all price-fixing conspiracies involve some affirmative acts of secrecy, the district court concluded that Congress in enacting Sec. 4B of the Clayton Act could not have intended that the fraudulent concealment doctrine would apply to toll the limitations period in all such cases. Marlinton, 874 F.Supp. at 726. The court below believed that applying a standard other than the separate and apart standard would "gut" the four-year statute of limitations. Id. at 727. We disagree with the district court's conclusions for several reasons.
 
 
 15
 First, with regard to legislative intent, in 1955 when Congress enacted Sec. 4B of the Clayton Act, courts applied the fraudulent concealment doctrine to all federal statutes. See Holmberg, 327 U.S. at 397, 66 S.Ct. at 585. Therefore, when adopting this statute of limitations, Congress presumably recognized that the fraudulent concealment doctrine would apply to extend the limitations period beyond four years in appropriate antitrust cases.[2] Language from the Supreme Court's opinion in Exploration Co. v. United States, 247 U.S. 435, 38 S.Ct. 571, 62 L.Ed. 1200 (1918), pertains equally well here. In that case, the Court stated:
 
 
 16
 When Congress passed the act in question, the rule of Bailey v. Glover was the established doctrine of this court. It was presumably enacted with the ruling of that case in mind. We cannot believe that Congress intended to give immunity to those who for the period named in the statute might be able to conceal their fraudulent action from the knowledge of the [victim].
 
 
 17
 Id. at 445, 38 S.Ct. at 572.
 
 
 18
 Furthermore, the adoption of the intermediate, affirmative acts standard would not "gut" the antitrust statute of limitations. Not all antitrust violations typically involve acts of secrecy or concealment. For example, attempts to monopolize in violation of 15 U.S.C. Sec. 2 and cases of interlocking directorates or officers in violation of 15 U.S.C. Sec. 19, do not typically involve secrecy or concealment. The four-year limitations period would generally apply to these actions without any equitable tolling. Indeed, contrary to the suggestion of the district court, application of this intermediate standard would not necessarily even result in equitable tolling in cases involving allegations of antitrust violations, like price-fixing, that are usually secret. In those cases plaintiffs would still be required to pursue their claims with due diligence and the failure to demonstrate such diligence would prevent them from establishing the third element of the fraudulent concealment test. Thus, upon examination, adoption of the intermediate, affirmative acts standards would not result in the problems that concerned the court below.
 
 
 19
 Conversely, the intermediate standard offers several significant advantages over the separate and apart standard that were not recognized by the district court. The intermediate standard would permit courts to avoid the difficult, if not impossible, task of deciding which acts are in furtherance of conspiracies and which acts are separate and apart from conspiracies. The Fifth Circuit noted this difficulty and concluded that "to consider only those acts of concealment completed subsequent in time to the wrong would lead to indefensible results." Allan Construction, 851 F.2d at 1532. The court suggested the following example to illustrate its concern: under the separate and apart standard, if documents were shred during a conspiracy, the shredding would not constitute evidence of concealment--yet exactly the same shredding occurring after the conspiracy would constitute evidence of fraudulent concealment. Id. The district court, in this case, responded to this example, stating that in its view of the separate and apart standard, shredding documents even while the conspiracy was taking place would constitute evidence of fraudulent concealment because "a conspiracy can be kept secret without such shredding." Marlinton, 874 F.Supp. at 726. These differing views on the admissibility of evidence under the separate and apart standard illustrate the difficulty in applying that standard. Furthermore, the district court's formulation is no more defensible than that rejected by the Fifth Circuit. We can see no valid reason to differentiate between those conspiracies in which the conspirators document their antitrust violations and subsequently shred those documents, from those in which the conspirators are careful not to write down evidence of their antitrust violations in the first place.
 
 
 20
 The balance of equities also favors adoption of the intermediate standard. Statutes of limitation are "vital" and "favored in the law" to protect defendants from stale or fraudulent claims. See Wood v. Carpenter, 101 U.S. 135, 139, 25 L.Ed. 807 (1879). That policy is subverted, however, if defendants are permitted to use statutes of limitation to shield themselves from liability for unlawful conduct by keeping that conduct secret. The equitable fraudulent concealment doctrine ensures that wrongdoers are not permitted, or encouraged, to take advantage of the limitations period to commit secret illegal conduct without penalty. In the words of the Supreme Court in Bailey:
 
 
 21
 To hold that by concealing a fraud, or by committing a fraud in a manner that it concealed itself until such time as the party committing the fraud could plead the statute of limitations to protect it, is to make the law which was designed to prevent fraud the means by which it is made successful and secure.
 
 
 22
 Bailey, 88 U.S. at 349. Adoption of the separate and apart standard would undercut the purpose of the fraudulent concealment doctrine merely to benefit those defendants who were cunning enough to commit their crimes initially in such a manner that there was no need for further concealment. As Judge Higginbotham explained for the Fifth Circuit when adopting the affirmative acts standard in preference to the separate and apart standard:
 
 
 23
 Through the statute of limitations Congress has chosen to confer on an accused wrongdoer the benefit of repose once the limitations period has passed. However, the equitable doctrine of fraudulent concealment recognizes that this benefit should not be available to a wrongdoer who takes undue advantage of the statute by attempting to conceal his conduct. The fact that such concealment occurs at the time of the wrong itself rather than afterwards does not make the wrongdoer any more deserving of the statute's protection.
 
 
 24
 Allan Construction, 851 F.2d at 1532 (footnote omitted).
 
 
 25
 Accordingly, the district court erred in applying the separate and apart standard rather than the intermediate, affirmative acts standard. The latter is consistent with Pocahontas and has significant advantages over the separate and apart standard. Moreover, our holding here is in accord with the weight of authority. Those of our sister circuits that have addressed the question in published opinions have either expressly or implicitly rejected the separate and apart standard and held instead that affirmative acts in furtherance of a conspiracy provide sufficient evidence of fraudulent concealment to establish the first element of the fraudulent concealment test. See Conmar Corp. v. Mitsui & Co., 858 F.2d 499, 505 (9th Cir.1988), cert. denied, 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); Allan Construction, 851 F.2d at 1532; Pinney Dock & Transport Co. v. Penn Central Corp., 838 F.2d 1445, 1472-74 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988).
 
 
 26
 Moreover, the principal authority upon which the court below and the dairies rely, the district court's decision in Western Paving, is hardly compelling. A panel of the Tenth Circuit initially reversed that decision. Western Paving, 833 F.2d 867 (10th Cir.1987). Although the Tenth Circuit, acting en banc, ultimately affirmed the district court, this was by the vote of an evenly divided court. Western Paving, 841 F.2d 1025 (10th Cir.1988). Such an affirmance is not entitled to precedential weight. See Neil v. Biggers, 409 U.S. 188, 192, 93 S.Ct. 375, 378-79, 34 L.Ed.2d 401 (1972). Thus, it is unclear whether the separate and apart standard applies even within the Tenth Circuit itself. See King & King Enters. v. Champlin Petroleum Co., 657 F.2d 1147, 1156 (10th Cir.1981) (fraudulent concealment toll applies where the "defendant actively sought to conceal its price-fixing activities, and the defendant's conduct, by reason of its fraudulent nature, was inherently self-concealing").
 
 
 27
 In addition, the district court's analysis in Western Paving is based on a misreading of prior case law. The Western Paving court relied on Board of Education v. Admiral Heating & Ventilation, Inc., 94 F.R.D. 300 (N.D.Ill.1982), and McConnell v. Frank Howard Allen & Co., 574 F.Supp. 781 (N.D.Cal.1983), as support for applying the separate and apart standard. Western Paving, 630 F.Supp. at 210. Those cases did apply the separate and apart standard, but not with respect to the first element of the fraudulent concealment test. Instead, the cases applied the standard with respect to the third element of the test, concerning the plaintiff's duty to exercise due diligence in discovering its claim. Those cases held that if the plaintiff proves the defendant committed acts of concealment separate and apart from the initial fraud, the due diligence requirement is waived. As an initial matter, that holding does not appear to be the law in this circuit. See Pocahontas, 828 F.2d at 218; Charlotte Telecasters v. Jefferson-Pilot Corp., 546 F.2d 570, 573 (4th Cir.1976); Weinberger v. Retail Credit Co., 498 F.2d 552, 555 (4th Cir.1974). Moreover, even if the holding of the cases relied on by Western Paving was correct as to the third element of the fraudulent concealment test, it obviously does not support the application of the separate and apart standard in determining if the plaintiff has satisfied the first element of that test.
 
 
 28
 For all of these reasons, we conclude that to satisfy the first element of the fraudulent concealment test, Marlinton must provide evidence of affirmative acts of concealment by the dairies. Those acts, however, need not be separate and apart from the acts of concealment involved in the antitrust violation; rather, Marlinton's proof may include acts of concealment involved in the alleged antitrust violation itself.
 
 III.
 
 29
 We now turn to the hearsay issue. Marlinton based its antitrust suit primarily on Paul French's testimony concerning alleged meetings with rival dairy officials to fix milk prices. In addition to supporting its core antitrust claim, Marlinton offered the testimony as evidence that the dairies had fraudulently concealed this claim. The district court assumed, for the purpose of its admissibility ruling, that French was unavailable to testify in person at the civil trial. Conceding that French's testimony from the criminal trial was hearsay, Marlinton contended that three exceptions to the hearsay rule applied to permit it to introduce the testimony: first, the exception for prior testimony (Fed.R.Evid.804(b)(1)); second, the exception for statements against interest (Fed.R.Evid.804(b)(3)); and third, the residual hearsay exception (Fed.R.Evid.804(b)(5)). The district court was not persuaded that any exception applied and concluded that the testimony was inadmissible hearsay.
 
 
 30
 We review the district court's evidentiary rulings for abuse of discretion. Persinger v. Norfolk & Western Ry., 920 F.2d 1185, 1187 (4th Cir.1990). The legal standards the district court applies in making its evidentiary rulings, however, are reviewed de novo. See United States v. Ellis, 951 F.2d 580, 582 (4th Cir.1991), cert. denied, 505 U.S. 1220, 112 S.Ct. 3030, 120 L.Ed.2d 901 (1992). Because we believe the district court applied an erroneous legal standard and therefore incorrectly determined that French's testimony was inadmissible under Rule 804(b)(1), we need not address Marlinton's arguments as to the other two hearsay exceptions.
 
 
 31
 Federal Rule of Evidence 804(b)(1) permits the introduction of "[t]estimony given as a witness at another hearing ... if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Recently, we noted that "[w]hen reviewing the admissibility of evidence pursuant to Rule 804(b)(1)," we focus "on the similarity of motives between the predecessor in interest and the one against whom the [testimony] is now offered." Horne v. Owens-Corning Fiberglas Corp., 4 F.3d 276, 282 (4th Cir.1993). When "the motives differ, the testimony may not be introduced." Id.
 
 
 32
 The district court reasoned that the defendants' sole motive for questioning French's testimony in the criminal trial had been to show that the conspiracy never happened, but that the dairies' motive in the case at hand, in accordance with the "separate and apart" standard, would be to show either that the conspiracy never happened or that if it did happen, any acts of secrecy committed were in furtherance of, rather than separate and apart from, the conspiracy. Marlinton, 874 F.Supp. at 725, 727. The court below determined the motives at the separate trials to be incompatible and, thus, French's testimony to be inadmissible under Rule 804(b)(1). Id. at 727. In doing so, the trial court acknowledged that its hearsay ruling depended on which of the three standards applied to determine whether the first element of the fraudulent concealment test had been met. Id. at 725. The court observed that the testimony would have been admissible "if the self-concealing standard applied, [because] then the motives of the individual defendants in the criminal case and the corporate defendants here would be similar." Id. This was because in both trials, the defendants' sole motive would be to show that the conspiracy never occurred.
 
 
 33
 Although we have in this case adopted the intermediate, affirmative acts standard, rather than the self-concealing standard, we nonetheless believe that French's testimony is admissible. This is so because to be admissible under Rule 804(b)(1), the party against whom the testimony was admitted in the prior proceeding need only have had a "similar motive," not an "identical motive," to the party in the second proceeding. United States v. Salerno, 505 U.S. 317, 326, 112 S.Ct. 2503, 2509, 120 L.Ed.2d 255 (1992) (Blackmun, J., concurring).[3] Here, the defendants' motivation in questioning French in the criminal trial--to show the conspiracy never occurred--although not identical, is substantially similar to the dairies' motivation, under the intermediate standard in the civil trial--to show the conspiracy never occurred, or that if it did, it happened without any affirmative acts of concealment. Indeed, because, as the district court recognized, most price-fixing conspiracies involve affirmative acts of concealment, the dominant motive in each trial is to show the conspiracy never occurred.[4]
 
 
 34
 As a secondary reason for rejecting French's testimony under Rule 804(b)(1), the district court stated that "[t]o the extent the predecessor in interest inquiry is still relevant following the Horne decision, the individual defendants in the criminal case are not predecessors in interest to the corporate defendants in the instant action." Marlinton, 874 F.Supp. at 727. We explained in Horne, "privity is not the gravamen of the [Rule 804(b)(1) ] analysis. Instead, the party against whom the [testimony] is offered must point up distinctions in her case not evident in the earlier litigation that would preclude similar motives of witness examination." Horne, 4 F.3d at 283. Like the party opposing admission of the evidence in Horne, the dairies offer no sufficient distinction here. Moreover, even if privity was a concern in the analysis under Rule 804(b)(1), it would present little problem here because the individual defendants in the prior criminal case were officials of one of the defendant dairy companies in the present civil suit. Cf. Clay v. Johns-Manville Sales Corp., 722 F.2d 1289, 1294-95 (6th Cir.1983) (Rule 804(b)(1)'s legislative history indicates that the phrase "predecessor in interest" should be construed in a broad manner), cert. denied, 467 U.S. 1253, 104 S.Ct. 3537, 82 L.Ed.2d 842 (1984).
 
 
 35
 Because the defendants' motive in questioning French in the criminal case was substantially similar to the dairies' motive in this civil action, French's testimony, assuming he is unavailable to testify, is admissible under Rule 804(b)(1).
 
 IV.
 
 36
 In summary, we here hold: (1) because this case does not involve an inherently self-concealing antitrust violation, the intermediate, affirmative acts standard should be used to determine if Marlinton has satisfied the first element of the fraudulent concealment test and (2) if unavailability is demonstrated, French's testimony is admissible under Rule 804(b)(1). We have thus addressed the rationale underlying the district court's opinion. The parties raise a number of other issues, which the district court did not reach and which we decline to consider in the first instance. Consequently, our holdings here do not necessarily mean that Marlinton is entitled to a trial on its antitrust claim.
 
 
 37
 Indeed, our holdings do not even eliminate the dairies' statute of limitations defense. Marlinton still must demonstrate that it has presented sufficient evidence to satisfy all three elements of the fraudulent concealment test. We do note that with regard to the third element of that test, the due diligence requirement, it is possible for a plaintiff to satisfy that element without demonstrating that it engaged in any specific inquiry. If the plaintiff establishes that it was not (and should not have been) aware of facts that should have excited further inquiry on its part, then there is nothing to provoke inquiry. See Taylor v. Meirick, 712 F.2d 1112, 1118 (7th Cir.1983) (if a plaintiff has no reason to suspect foul play, "there may be no duty of inquiry at all"); see also Conmar Corp., 858 F.2d at 504 (diligence requirement "is only meaningful ... when facts exist that would excite the inquiry of a reasonable person"). Furthermore, if reasonable further inquiry would not have revealed the basis for the antitrust claim, the plaintiff's claim is not time-barred. See Glazer Steel Corp. v. Toyomenka, Inc., 392 F.Supp. 500 (S.D.N.Y.1974). The district court did not address the issue of whether Marlinton was aware of facts that should have induced further inquiry on its part.
 
 
 38
 Also still unresolved is Marlinton's standing.[5] We similarly decline to address this question, which has not yet been considered by the district court or even fully briefed by the parties. The dairies insist that Marlinton has not proved "injury in fact," and that such proof is necessary to establish standing. Marlinton responds that it need only prove "injury in fact" as part of damages, not standing, and that its suit against the dairies had not progressed to the damages stage before the district court granted summary judgment to the dairies. Marlinton is correct that ultimate proof of injury in fact only becomes necessary at the damages stage in order for the plaintiff to recover damages, see J. Truett Payne Co. v. Chrysler Motors Corp., 451 U.S. 557, 562, 101 S.Ct. 1923, 1927, 68 L.Ed.2d 442 (1981), but evidence of injury in fact is also relevant in determining standing. It is not, however, the only issue relevant to that determination, although it is the only standing issue briefed by the parties.
 
 
 39
 Rather, the determination of whether a plaintiff has standing to bring an antitrust action requires analysis of numerous factors including:
 
 
 40
 the risk of duplicative recovery by multiple antitrust claimants; the extent to which the claim is based upon speculative, abstract, or impractical measures of damages; the causal connection between the alleged violation and the harm suffered; and the relationship of the injury alleged to the forms of injury about which Congress was concerned when it created a private remedy.
 
 
 41
 Pocahontas, 828 F.2d at 219 (citations omitted). A court must "assess the particular facts of each case" in light of all of these standing factors. Id. The district court did not address the standing issue at all, let alone engage in this assessment. On remand it will have an opportunity to do this with the assistance of complete briefing by the parties.
 
 
 42
 REVERSED AND REMANDED.
 
 
 
 [1]
 We do note that the district court misread Pocahontas to the extent that it found that we "excluded" the possibility of adopting the self-concealing standard in all antitrust cases. If an antitrust violation were demonstrated to be in its very nature deceptive, i.e., concealment was an element of the offense rather than merely a method of hiding it, then application of the self-concealing standard might well be appropriate. The State of Maryland, joined by a number of other states, has filed an amici curiae brief suggesting that "[b]id-rigging is inherently a secret endeavor. If procurement officers knew that bids were rigged, they would reject the conspirators' bids and bidriggers would be subject to criminal prosecution and civil treble damage litigation." There is some support for this theory in the case law. See Hendrickson Bros., 840 F.2d at 1085; but see Allan Construction, 851 F.2d at 1530-31. We need not here resolve the question of whether bid-rigging or some other antitrust violation is truly self-concealing in a way that ordinary price-fixing is not because neither bid-rigging nor any other inherently deceptive antitrust violation is alleged here. Rather, the sole allegation is that the dairies engaged in price-fixing. Although such activity is generally secretive, it need not be so, as even the amici concede
 
 
 [2]
 In fact, the legislative history of Sec. 4B suggests that in enacting it Congress knew and approved of the applicability of the fraudulent concealment doctrine in antitrust cases. Thus, while the Chairman of the Judiciary Committee who reported the bill opposed an amendment (which ultimately failed) requiring that the limitations period run from discovery in all cases, he assured his colleagues that even without the amendment, "[i]n the case of fraud or conspiracy the statute of limitations only runs from the time of discovery." 101 Cong.Rec. 5133 (1955) (emphasis added)
 
 
 [3]
 See United States v. Licavoli , 725 F.2d 1040, 1048 (6th Cir.) (criminal trial testimony admissible in subsequent federal RICO trial even though "enterprise" requirement added a new issue, because issues in both trials were sufficiently similar that defendants had the same motive to develop the testimony), cert. denied, 467 U.S. 1252, 104 S.Ct. 3535, 82 L.Ed.2d 840 (1984); DeLuryea v. Winthrop Labs., 697 F.2d 222, 226-27 (8th Cir.1983) (doctor's testimony at prior worker's compensation hearing admissible at subsequent products liability suit because "purpose" of earlier testimony was such that party had similar motive to develop testimony); Murray v. Toyota Motor Distribs., Inc., 664 F.2d 1377, 1379 (9th Cir.) (testimony in first proceeding relating to conduct in Arizona, Nevada, Texas, and California, admissible in second proceeding involving Montana, because motive to develop testimony in both cases need only be " 'similar,' not identical"), cert. denied, 457 U.S. 1106, 102 S.Ct. 2905, 73 L.Ed.2d 1314 (1982)
 
 
 [4]
 Furthermore, it appears that the defendants in the criminal trial did in fact cross-examine French concerning alleged acts of concealment involved in the conspiracy. For example, as to French's allegation that he had "disguised" his secret meetings with rival dairy officials by including only their first names in his expense accounts, the defendants cross-examined him as to why he also appeared to have used only first names to designate his co-workers in relation to ordinary work meetings
 
 
 [5]
 Marlinton has alleged sufficient injury to provide it standing to bring this action. Whether it can offer sufficient evidence to present a factual question as to these allegations is a question to be addressed by the district court on remand